THOMAS C. JARDIM, MEMBER
JARDIM, MEISNER & SUSSER, P.C.
30B VREELAND ROAD, SUITE 201
FLORHAM PARK, NJ 07932
TOM@JMSLAWYERS.COM
(973) 845-7640

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------------------------------------------)
                                                                          )

| | |
|---|---|
| STEPHEN SIMONI, an Individual, | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) Hon. Joel A. Pisano |
| | ) |
| vs. | ) Case No.  3:10-cv-06798-JAP-LHG |
| | ) |
| EDWARD DIAMOND, Individually and as Manager Cardiac<br>     Services of JSUMC, | ) |
| KATHRYN J. ("KATIE") LUCIANI, SPHR, Individually and as<br>     Human Resources Site Manager of JSUMC, | ) SECOND AMENDED COMPLAINT |
| MERIDIAN HEALTH SYSTEMS, INC., | ) FOR DECLARATORY AND |
| MERIDIAN HEALTH, INC., | ) INJUNCTIVE RELIEF AND |
| MERIDIAN HOSPITALS CORP., | ) COMPENSATORY AND |
| MERIDIAN HEALTH, | ) PUNITIVE DAMAGES |
| DONNA M. CUSSON, Individually and as Assistant Nurse<br>     Manager Invasive Cardiology of JSUMC, | ) |
| JERSEY SHORE UNIVERSITY MEDICAL CENTER ("JSUMC"), | ) JURY TRIAL DEMANDED |
| ERICKA D. CLARK DISTANISLAO, Individually and as Staff<br>     Nurse and Preceptor Invasive Cardiology of JSUMC, | ) |
| JENNIFER S. LOVEY, Individually and as Staff Nurse and<br>     Preceptor Invasive Cardiology of JSUMC, | ) |
| HEALTH PROFESSIONALS AND ALLIED EMPLOYEES, AFT/<br>     AFL-CIO ("HPAE"), and | ) |
| HPAE LOCAL # 5058, | ) |
| | ) |
| Defendants. | ) |

-----------------------------------------------------------------------------)

Plaintiff STEPHEN SIMONI ("**Nurse**"), an Individual, by this Second Amended Complaint, against JERSEY SHORE UNIVERSITY MEDICAL CENTER ("**JSUMC**"), MERIDIAN HEALTH SYSTEMS, INC., MERIDIAN HOSPITALS CORP., MERIDIAN HEALTH, INC., and MERIDIAN HEALTH (collectively, with JSUMC, the "**Corporate Defendants**"), EDWARD DIAMOND, Individually and as Manager Cardiac Services of JSUMC ("**Diamond**"), KATHRYN J. ("KATIE") LUCIANI, SPHR, Individually and as Human Resources Site Manager of JSUMC ("**Luciani**"), DONNA M. CUSSON, Individually and as Assistant Nurse Manager Invasive Cardiology of JSUMC ("**Cusson**"), ERICKA D. CLARK DISTANISLAO, Individually and as Staff Nurse and Preceptor of JSUMC ("**Clark**"), and JENNIFER S. LOVEY, Individually and as Staff Nurse and Preceptor of JSUMC ("**Lovey**") (Diamond, Luciani, Cusson, Clark, and Lovey collectively, "**Individual Defendants**") (Corporate Defendants and Individual Defendants collectively, "**Hospital Defendants**"), and Defendants HEALTH PROFESSIONALS AND ALLIED EMPLOYEES, AFT/AFL-CIO ("**HPAE**") and HPAE LOCAL # 5058 (HPAE and HPAE LOCAL # 5058, collectively "**Union**"), avers as follows:

## PARTIES

1.  Plaintiff Stephen Simoni ("**Nurse**") is an individual residing in Monmouth County, New Jersey.

2.  Defendant JERSEY SHORE UNIVERSITY MEDICAL CENTER ("**JSUMC**") is a Health Care Facility as defined in N.J.S.A. 26:2H-2(a) and is located at 1945 Route 33, Neptune, New Jersey 07753.  MERIDIAN HEALTH SYSTEMS, INC., MERIDIAN HOSPITALS CORP., MERIDIAN HEALTH, INC., and MERIDIAN HEALTH are corporate parents, affiliates, and partners of JSUMC.

3.  Defendant EDWARD DIAMOND ("**Diamond**") is an individual and Manager Cardiac Services of JSUMC who resides in New Jersey.

4.  Defendant KATHRYN J. ("KATIE") LUCIANI, SPHR ("**Luciani**") is an individual and Human Resources Site Manager of JSUMC who resides in Oakhurst, New Jersey.

5.  Defendant DONNA M. CUSSON ("**Cusson**") is an individual who was Assistant Nurse Manager Invasive Cardiology of JSUMC during the relevant time period who resides in Freehold, New Jersey.

6.  Defendant ERICKA D. CLARK DISTANISLAO ("**Clark**") is an individual and Staff Nurse and Preceptor Invasive Cardiology of JSUMC who resides in New Jersey.

7.  Defendant JENNIFER S. LOVEY ("**Lovey**") is an individual and Staff Nurse and Preceptor Invasive Cardiology of JSUMC who resides in Howell, New Jersey.

8.  Defendant HEALTH PROFESSIONALS AND ALLIED EMPLOYEES, AFT/AFL-CIO ("HPAE") is the employee organization that contracted with JSUMC on behalf of Registered Professional Nurse employees thereat and is located at 110 Kinderkamack Road, Emerson, New Jersey 07630.  HPAE LOCAL # 5058 is the HPAE Local for JSUMC Registered Professional Nurse employees and maintains an office at Office #7, 2260 State Highway 33, Neptune, New Jersey 07753.

## JURISDICTION AND VENUE

9.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. section 1331 in that the matter in controversy concerns violations of rights created under various federal statutes and under 28 U.S.C. section 1367 concerning claims related thereto.

10.  Venue is proper in the District of New Jersey pursuant to 28 U.S.C. section 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims referenced herein occurred in this District.

## NURSE APPLIES FOR EMPLOYMENT WITH DEFENDANTS IN DECEMBER 2009

11.  In December 2009, Nurse submitted an application on-line to Corporate Defendants' Cardiac Catheterization Laboratory and applied for licensure as a Registered Professional Nurse in New Jersey.

12.  In February 2010, Nurse met with defendant DONNA M. CUSSON to discuss possible employment at JSUMC Cardiac Catheterization Laboratory ("JSUMC Cath Lab"), handed Cusson his resume, and followed up with an e-mail message.

13.  Nurse received an offer of employment from the JSUMC Cardiac Catheterization Laboratory.

14.  JSUMC detailed—and continues to detail—on its website that its "Orientation for Experienced Nurses" includes "the same steps as the new graduate," including a Preceptorship in which the employees "*receive continuous feedback from their preceptors via the <u>daily coaching form</u>*" (emphasis added).

**PURPORTED "EMPLOYEE HANDBOOK" NEVER PROVIDED**

15.  On August 10, 2010, Nurse attended Meridian Health's "Beginnings" program at JSUMC with other new employees who started work for Corporate Defendants that month, which program included both bargaining unit and nonbargaining unit employees.  At "Beginnings," defendant KATHRYN J. ("KATIE") LUCIANI, SPHR ("Luciani") asked the new employees whether they had received "employee handbooks" and seemed surprised that they had not received employee handbooks, as one new employee explained to Luciani in front of the other new employees that Meridian Health Human Resources Center for Talent Selection had informed new employees that employee handbooks no longer were being distributed.

16.  Human Resources Generalist Joan Bruno then informed Luciani in front of the new employees that the employee was correct:  Human Resources was no longer distributing employee handbooks, none had been distributed to new employees, and there was no plan to distribute any in the future.  Accordingly, Nurse was never given an employee handbook nor the information such an "employee handbook" may contain during Nurse's employment with Corporate Defendants.

17.  It has only been because of the original Complaint's filing in this action that Nurse ever saw the document that the Corporate Defendants and Individual Defendants now reference as "Meridian Hospital's Corporation Employee Handbook" [sic], which bears the date September 2001 (nearly ten years prior to Nurse's first day of employment with Corporate Defendants) and appears as Exhibit D to the Certification of Fox Rothschild LLP's Sarah Beth Johnson in Support of Defendants' Omnibus Motion dated March 28, 2011; tellingly, the document specifically states at its beginning in a section titled, "Note to Bargaining Unit Employees," the utter irrelevance of the document to the instant action:

> This Handbook is designed for ***nonbargaining*** unit employees.  If you are in a bargaining unit, you should **refer to the Collective Bargaining Agreement** for specific information relative to your wages, hours, and **terms and conditions of employment**.

Id. (emphases added).

4

## CORPORATE "CODE OF CONDUCT"
## REQUIRES REPORTING VIOLATIONS OF HEALTH CARE LAWS

18.  On August 23, 2010, Nurse attended Meridian Health's "Traditions" program at Corporate Defendants' office with other new employees who started work for Corporate Defendants that month.  At "Traditions," all new employees were required to acknowledge in writing their receipt of the booklet "Code of Conduct:  Organizational Ethics," which states (i) the requirement that, *inter alia*, all employees "adhere to the Code" or face disciplinary action, (ii) the "duty to report any suspected violations of the Code of Conduct," and (iii) the assurance that Meridian Health "will not tolerate retaliation in any form against any individual who brings suspected violations to the attention of management."  Significantly, the Code provides:

> [O]ur number one priority is to provide quality health care services to all of our patients[,]  ***[t]he provision of health care services to patients must comply with all federal and state laws, regulations, guidelines and policies[,*** and ] ***failing to report a suspected violation [of the Code of Conduct itself constitutes] failure to comply with th[e] Code of Conduct[.]***

Id. (emphases added).

## CORPORATE DISCIPLINARY & TERMINATION PROVISIONS

19.  Meridian Health's "Guidelines for Cooperation and Discipline" written by John Sindoni and in effect since January 14, 2003 (annexed hereto as Exhibit A) provides a detailed four-step progressive disciplinary process for "[a]ll team members of Meridian Health and its partner companies, including Meridian Hospitals Corporation and its hospitals," which provides, *inter alia*, that (i) "These guidelines will be centrally administered and ***uniformly interpreted to ensure equity of application within Meridian Health***;" (ii) "Unless there is insubordination or a demonstrated clear and present danger to patients or staff personnel, a team member should not be ***suspended*** [let alone, ***terminated***] prior to review and consultation taking place with the director of human resources, the senior vice president of human resources, administrative representative or administrator-on-call;" (iii) "In cases . . . where discharge from staff is requested, a three-step process will be followed which involves a three (3) day suspension without pay, investigation of charges and a disciplinary review process meeting to establish either upholding

the suspension, termination, or reinstatement;" (iv) "In cases which result in a suspension or termination, the team member may request a Board of Review in connection with the Guaranteed Fair Treatment Policy;" and (v) "No team member will be discharged from staff without the disciplinary review process."  Exh. A at 1, 2 & 5 (emphases added).

20.  The Guidelines for Cooperation and Discipline includes a "Special Note" specifying that ***only those "[t]eam members who are in a leadership role*** includ[ing] positions such as executives, administrators, directors, department leader middle management, front line supervisors and above ***are employed at-will***.  This means that either they or Meridian can terminate their employment at any time, for any or no reason and with or without notice."  Exh. A at 7 (emphases added).

21.  Nurse's position as Staff Nurse is ***not*** a "leadership role."

22.  In August 2010, the Nursing Education Department at hospital-wide Orientation introduced Nurse and other new employees to the "Daily Coaching Plan" form, a two-page form that provides extensive guidance and detail for the Preceptor in orienting the Orientee (annexed hereto as Exhibit B).  As indicated in Exhibit B, on both pages of the Daily Coaching Plan form and as emphasized in bold shading, underlined type, and capital letters thereon, "**This form is to be completed DAILY and turned into the Nurse Manager at the end of each shift.**"  Moreover, the form contains spaces for both the Preceptor's and Orientee's signatures and each page consists of three carbon copies as noted, "White Copy--Orientee ,  Yellow Copy--Nurse Manager,  Pink Copy--Nursing Education" (only the White Copy of each sheet is annexed hereto as Exhibit B).  These documentation procedures are presumably intended to ensure that any areas needing attention will be communicated to the Orientee daily so that an opportunity to become acquainted with JSUMC forms, policies, computers, and equipment is afforded and prevents Preceptors and Managers with ulterior motives from falsely claiming that communication of one or more of any such areas was made to the Orientee.

23.  In August 2010, the Nursing Education Department at hospital-wide Orientation introduced Nurse and other new employees to the "Introductory Period Assessment 2010" form, an eleven-page form that provides a comprehensive assessment and evaluation of the new employee during the initial 90 days of employment and contains numerous areas for the insertion of "comments" by the new employee in response to each specific rating.

**CORPORATE DEFENDANTS REQUIRE ADHERENCE TO**
**AMERICAN NURSING ASSOCIATION ETHICS AND NEW JERSEY NURSE STATUTE**

24.  The Introductory Period Assessment 2010 form, *inter alia*, details JSUMC's requirement that Registered Professional Nurses "work in accordance with the New Jersey Nurse Practice Act [and] utilize ethical practices as outlined in the [American Nurses Association ("ANA")] code of ethics."

25.  Corporate Defendants **explicitly required** their Registered Professional Nurses to **"report illegal, incompetent or impaired practice,"** as required by the New Jersey Nurse Practice Act and detailed in the American Nurses Association's Nursing:  Scope and Standards of Practice Standard 12 ("Ethics"), as an integral component of the American Nurses Association Code of Ethics' statement that "[t]he nurse promotes, advocates for, and **strives to protect the health, safety, and rights of the patient"** (emphasis added).  JSUMC reinforces the requirement that its Registered Professional Nurses comply with "Standard 12 Ethics" by including it as part of the annual assessment process where nurses are directed to "[c]orrect[] potential safety hazards . . . **and report them"** (emphases added).

26.  The American Nurses Association, moreover, requires that nurses "be alert to and take appropriate action regarding any instances of **incompetent, unethical, illegal or impaired practice  .  .  .  that places  .  .  . the patient in jeopardy."**  ANA Code of Ethics Prov. 3.5 (emphasis added).

27.  The Introductory Period Assessment 2010 form further states, *inter alia*, that its Registered Professional Nurses "should become nationally certified" and details that JSUMC awards "a point" in the annual assessment process if the nurse earns National Certification and notes that if National Certification is not achieved, other goals will be utilized for the nurse's evaluation.

**CORPORATE DEFENDANTS AND UNION DETAIL**
**TERMINATION PROVISIONS OF COLLECTIVE BARGAINING AGREEMENT ("CBA")**

28.  Several documents and sheets were distributed by the Nursing Education Department at the hospital-wide Orientation for new nurses in August 2010, including a sheet titled, "Frequently Asked Questions," that stated as the answer to the sheet's first question, "Welcome!  You are now a member of the Health Professionals and Allied Employees, AFT, AFL-

CIO, the largest union of health care professionals in New Jersey."  A second sheet titled, "Your Rights in the Workplace," assured the individual that "you have the right to Union protection and representation—rights that are guaranteed by your contract."  The "Rights" sheet specified, "The key question that decides grievances involving discipline is:  ***Did management have 'just cause' for imposing the discipline?***" (emphasis added).

29.  The Collective Bargaining Agreement covering JSUMC nurses ("CBA") was also distributed by the Nursing Education Department at the hospital-wide Orientation in August 2010 noted above and detailed the "RN Preceptor Program" objective of "differentiat[ing] Meridian Health from other hospital employers and deliver[ing] a true competitive advantage for hiring and retaining nurse professionals."  Specifically, the CBA stated that the Preceptor "***[p]rovides feedback to the employee on a daily basis,***" "evaluates progress toward fulfilling designated goals and objectives on a weekly basis," and "[p]rovides a written evaluation to the new employee at the conclusion" (emphasis added).  Stated Preceptor Performance Criteria encompasses the Preceptor's "[a]cting as a role model for the new employee by adhering to nursing policies and procedures when giving patient care."

30.  The CBA further detailed the numerous job-security provisions afforded to the nurses in accordance with organized labor's history of ensuring that workers are disciplined and terminated only where "just cause" for such action exists, thereby precluding the involvement of favoritism, partiality, and mean-spirited, unfair, arbitrary, and irrational activity on the part of employer, management and co-workers.  The CBA guaranteed, *inter alia*, that (i) ***"any employee" could only be "discipline[d], suspend[ed], or discharge[d]" for "just cause***;" (ii) all "employees shall receive a performance appraisal" at the end of their first three months of employment and the first quarter of each year thereafter and that all "such performance appraisals may be grieved pursuant to Section 13 of this [CBA];" (iii) "The orientation period will be extended at the request of the employee being oriented;" and (iv) "Prominent among the rights reserved to and retained by the Employer . . . are the ***sole right to hire, discipline or discharge for just cause***" (emphases added).

31.  The CBA made no distinctions among employees regarding the "just cause" requirement for discipline, suspension, or discharge, but instead encompassed all Full Time Permanent Employees, Part Time Permanent Employees, and Per Diem Employees.

32.  The CBA further prohibited discrimination against "**any employee**" "in any matter relating to employment" on the basis of the **person's sex** and/or because **the person "has filed any complaints or grievances with the Hospital**."  CBA § 19 (emphases added).

33.  Likewise, the CBA made no distinctions among employees regarding the discrimination prohibitions, but instead encompassed all Full Time Permanent Employees, Part Time Permanent Employees, and Per Diem Employees.

34.  In addition, the CBA detailed numerous other guarantees for all employees, regardless of time worked at JSUMC, including pay scales, meal breaks, and floating assignments. The CBA limited the rights of new employees only in two minor ways:  prohibiting the use of vacation time and participation in the CARE program until 90 days have passed.

35.  At the hospital-wide Orientation conducted in August 2010 for new nurses by the Nursing Education Department, Nurse and other new nurses completed the written forms that enrolled them as members of the Union and provided permission for Corporate Defendants to withhold Union dues from the nurses' paychecks in accordance with section 2.03 of the CBA.  CBA § 2.03.  Consequently, Corporate Defendants withheld Union dues and payments to the Union Retire Medical Trust from Nurse's JSUMC paychecks during his employment at JSUMC Cath Lab.

## INDIVIDUAL DEFENDANTS PROVIDE NURSE
## A SHAM PRECEPTORSHIP, DEFAME NURSE, AND TERMINATE NURSE

36.  Preceptorships of nurses at JSUMC Cath Lab consist of three approximately four-week periods, during each of which the newly-hired nurse is assigned to a unique Preceptor.

37.  For the first four-week period, defendant ERICKA D. CLARK DISTANISLAO ("Clark") was assigned as Nurse's Preceptor.

38.  Clark made very little effort to orient Nurse.

39.  When Nurse asked a question, Clark's standard, trite response was, "You should know that."

40.  Although Nurse requested repeatedly that Cusson assign him a different Preceptor in accordance with the Corporate Defendants' "RN Preceptor Program" rather than require Nurse to spend the four scheduled weeks with Clark, Cusson refused.  Clark and Cusson are

long-time friends and remain in constant contact outside work on the social media Internet site Facebook® and other social media Internet sites.

41.   Moreover, Clark regularly ignored Nurse's exhortations to attach post-intervention patients to mobile monitors for transport to other Units as required, thereby further threatening the safety of patients under Clark's "care."

42.   When another nurse in the JSUMC Cath Lab informed Clark that Cusson had passed a national certification exam she had taken that day, Clark responded angrily by predicting, "Damn, now she's really going to be 'on us' to pass ours," referencing the posted requirement that the JSUMC nurses make an attempt to pass a certification exam by the end of October 2010 in accordance with the CBA, the passing or failing of which would be considered in the nurse's annual performance assessment.

43.   Neither Clark nor any other person provided Nurse with any Daily Coaching Plan forms nor any other checklist, document, Introductory Period Assessment 2010 form, or written evaluation of Nurse's Orientation.

44.   Neither Clark nor any other person met with Nurse to discuss the progress of Nurse's Orientation.

45.   By so reporting Clark's Code of Conduct violations to Diamond and Cusson, Nurse complied with Corporate Defendants' Code of Conduct's provision that states that violations of the Code should be raised ***"first with your supervisor [or] department manager"*** (emphasis added).  Cusson was Nurse's supervisor and Diamond was Nurse's department manager.

46.   Nurse and Diamond discussed the likelihood that Clark was "setting herself up perfectly to fail" her national certification exam by falsely portraying Nurse, who had already earned two national certifications, as "not getting the big picture."

47.   Nurse emphasized to Diamond that Nurse independently performed well in Cath Lab procedures at the New York City hospital and that Nurse would obtain additional references from the prior employer to reassure Diamond in light of Clark's amorphous and baseless criticism of "not getting the big picture."  Nurse then provided Diamond with such references.

48.   No Defendant ever provided definition or clarity of "not getting the big picture;" indeed, such term is indefinable and was exploited as a means of criticizing Nurse through imagery and without any fact, particularity, or other objective criterion.

49.  Diamond replied that defendant JENNIFER S. LOVEY ("Lovey") was Nurse's Preceptor for the next four weeks (to be followed by a third Preceptor for the third four-week period in accordance with the structure of JSUMC Cath Lab Preceptorships), that Lovey was "passionate" about her work, and that Nurse, Lovey, Diamond, and Cusson would meet weekly to discuss Nurse's Orientation and acquainting with the new equipment, forms, computers, and policies at JSUMC, including the intravenous fluid pumps, with which Clark failed to acquaint Nurse, and the ACT machines.

50.  Cusson stated that she would obtain a beeper for Nurse in order that Nurse could obtain additional experience responding to "call" even when Nurse was not scheduled for "call," which other JSUMC Cath Lab Staff Nurses had done during their Orientation.

51.  Despite numerous requests for the beeper by Nurse, Cusson never provided it.

52.  During the four weeks when Lovey was assigned as Nurse's Preceptor, Lovey regularly praised Nurse's work and at times in fact acquainted Nurse with the use of the JSUMC Cath Lab's versions of specialized equipment (e.g., FFR, IABP, IVUS) that differed from the manufacturer's equipment utilized in the New York City Cath Lab, which, while on the verge of bankruptcy for years, did not always have the state-of-the-art models that JSUMC Cath Lab does.

53.  By the second week of the time that Lovey was assigned to Nurse, Lovey was so confident in Nurse's work that she spent much time outside the procedure room and watched as Nurse effectively handled cases single-handedly, several physicians complimented Nurse's performance, and Lovey assured Cusson and Diamond there was no need to meet weekly with Nurse to discuss deficiencies for the simple reason that there were no deficiencies to address; consequently, absolutely no such meetings were held.  While Nurse independently handled cases in the procedure room, Lovey remained outside where she made and received personal phone calls, sent and read personal text messages, and sent and accessed personal e-mails and attended to numerous other personal matters on the Internet on both Corporate Defendants' equipment and connections and her own equipment and connections about matters such as the university degree she was pursuing, delivery of her new cell phone to her son at her residence, the lawsuit she had filed against a former patient of the JSUMC Cath Lab, and her father's medical procedure.

54.  Near the end of the final day on which Lovey was assigned as Nurse's Preceptor, Cusson called Nurse into Cusson's office and showed Nurse sheets on which Lovey had handwritten purported deficiencies in Nurse's work (***but did not permit Nurse to retain those***

*sheets nor copies thereof*), rather than meeting together with all four of Lovey, Cusson, Diamond, and Nurse on a weekly basis (or more frequently, as indicated) as had been required by Diamond to immediately assess Nurse's work face-to-face and ensure that Nurse's performance was free of deficiency.

55.   Other than this single meeting on the final day of the Lovey Preceptorship— which consisted solely of Cusson and Nurse—neither Lovey, Diamond, Cusson nor any other person met with Nurse at any time to discuss the progress of Nurse's Orientation *during the entire four weeks that Lovey was assigned as Nurse's Preceptor.*

56.   Moreover, other than the handwritten sheets referenced above, neither Lovey, Diamond, Cusson nor any other person showed or provided Nurse any Daily Coaching Plan forms nor any other checklist, document, Introductory Period Assessment 2010 form, or written evaluation of Nurse's Orientation *during the entire four weeks that Lovey was assigned as Nurse's Preceptor.*

57.   Lovey had been prevailed upon at the eleventh hour by Cusson, Diamond, and Clark to, in any way possible, portray a negative view of Nurse's work.

58.   Because Lovey had very little, if anything, to criticize, her strange "criticisms" included that Nurse moved about the JSUMC Cath Lab procedure room during catheterizations and thereby caused a "distraction," a supposed concern she had never verbalized to Nurse during their four-week Preceptorship period together.

59.   When Nurse was hired and started work at JSUMC Cath Lab, Cusson and Diamond believed that the ongoing transfer of an Assistant Nurse Manager from the JSUMC Cath Lab to a Staff Nurse position in the JSUMC Electrophysiology Lab ("EPS Lab") would result in an additional Staff Nurse opening being created in the JSUMC Cath Lab.

60.   After reading Lovey's handwritten sheets in Cusson's office, Nurse went to discuss the purported deficiencies with Lovey and told Lovey in the doorway of the control room between JSUMC Cath Lab procedure rooms 1 and 2 as Lovey exited with Orders from the printer, "I thought you had more integrity than that."

61.   Lovey then walked away with the Orders to transport a patient and had apparently asked a JSUMC Cath Lab technician to assist her, refusing Nurse's effort to assist in transporting Lovey's and Nurse's assigned patient and stating that Lovey did not want Nurse's help.

62. Later that night, Nurse sent the following e-mail to Cusson:

Donna,

When you, Ed, and I met four weeks ago to discuss the ill-advised placement of a new employee with Ericka, we all agreed that I would thereafter be assigned to Lovey and that we would meet weekly, if not more frequently, to immediately assess my work and ensure that my performance matched the experience gained from my 4 months at St. Vincent's Cath Lab, as evidenced by the reference I subsequently obtained for you and Ed from the medical director of St. Vincent's former lab and the references I supplied during the hiring process from St. Vincent's Cath Lab Nurse Mgr and Cardiac Cath/Critical Care Educator. The four weeks with Lovey were uneventful in that she regularly praised my work, several physicians complimented my performance, and mgm't recognized there was no deficient performance to review; accordingly, you, Ed, and I had no reason to meet and never did meet. However, within the past 24 hours, Lovey's attitude changed abruptly, she stopped speaking with me, avoided eye contact, ran away from me during lunch today, and then presented you a handwritten list of supposed "errors" that lead you to state on my very last night with Lovey that I would be terminated at the end of the probationary period unless my work "improved." When I was hired, all I could expect was a good-faith opportunity to do the job coming in with my limited four months Cath Lab experience. For whatever unspoken reasons--though I have my suspicions--Lovey apparently was persuaded at the eleventh hour to in any way possible portray a negative view of my work. Because she of course had very little to work with, her strange criticisms included that I moved about the procedure room during catheterizations and thereby caused a "distraction." I am flabbergasted and told Lovey after that I thought she had "more integrity than that." I look forward to discussing this with you. –[Nurse]

63. Nurse went to JSUMC on the day following the meeting with Cusson (a day on which Nurse was not scheduled to work) and attempted to speak with the Director of Nursing, Richard Hader, but learned that Hader was in Arizona at a conference.

64. Nurse then met incoming Director of Nursing Mary Ann Donahue in the hallway and requested to speak with her; Donahue stated that she was not available to meet with him at that time, but invited Nurse to schedule an appointment with Donahue's secretary. Unfortunately, the only mutually available time was five days later (which turned out to be one day after Nurse's termination, as detailed below).

65. After Nurse and the new Preceptor worked together and engaged in various patient care duties, Diamond and Cusson spoke with the new Preceptor outside of Nurse's

13

presence.

66.   Ten minutes later, after the Preceptor had indicated she refused to engage in the ongoing conspiracy to defame Nurse, Diamond abruptly pulled Nurse from patient care duties and brought him into Cusson's office where he told Nurse he was terminated.

67.   In response to Nurse's correct statement that Diamond could not terminate Nurse, Diamond stated that he had "HR's" approval without providing any names of Human Resources personnel and demanded that Nurse relinquish his JSUMC identification card in Cusson's presence.

68.   On the way to the JSUMC exit, Nurse went to speak with the Director of Nursing, Richard Hader, who was not in the office.

69.   Nurse left a message for Hader with a secretary, but never heard back from Hader.

70.   Nurse sent e-mails to Human Resources Generalist Joan Bruno and Meridian Health Center for Talent Selection's Gena Cagle, who had extended Nurse the offer of JSUMC Cath Lab employment, and followed up with a telephone call, but heard back from no one.

71.   The Corporate Defendants caused a several months delay in initiation of the legal action by Nurse to address the illegal termination by assuring Nurse that they were engaging in an "investigation" of Nurse's request for redress of the illegal termination.

72.   Corporate Defendants then ratified the termination and defamation of Nurse by Luciani's December 21, 2010 termination letter, which made clear that Luciani communicated with and gave credence only to employees and low-level managers—all of whom had violated the Corporate Defendants' Code of Conduct—during the purported "investigation" of Nurse's termination and prior to providing Corporate Defendants' ratification of Nurse's termination. Crucially, Luciani's letter was provided only ***after*** Nurse provided Corporate Defendants a draft of a court Complaint prior to its filing in an effort to avoid invocation of the legal process.

## AS AND FOR A FIRST CAUSE OF ACTION

**(Union and Corporate Defendants)**

**(Hybrid Section 301/Duty of Fair Representation Claim:
Violation of Section 301 of the Labor Management Relations Act,
29 U.S.C. sec. 185, and the National Labor Relations Act's Duty of Fair Representation)**

73.  Nurse repeats and realleges each and every allegation set forth above as if fully set forth herein.

74.  Corporate Defendants breached the CBA and the Union violated its duty of fair representation to Nurse when requested to remedy same:  the CBA (i) requires "just cause" for termination of "any employee," (ii) requires numerous other procedural and substantive guarantees prior to discipline and/or termination of "any employee," (iii) provides that "employees shall receive a performance appraisal" at the end of their first three months of employment and the first quarter of each year thereafter and that all "such performance appraisals may be grieved pursuant to Section 13 of this [CBA]," (iv) provides that "[t]he orientation period will be extended at the request of the employee being oriented," and (v) prohibits discrimination of "any employee" "in any matter relating to employment" because the (a) person is a "member of the Union," (b) because of the person's sex, and/or (c) because the person "has filed any complaints or grievances with the Hospital."

75.  Corporate Defendants breached the CBA by terminating Nurse without just cause, denying him the CBA's numerous procedural and substantive guarantees prior to termination, failing to provide him the required performance appraisal (and thereby precluding Nurse from grieving the required performance appraisal), failing to extend the "orientation period," and discriminating against Nurse because of his sex and because he filed a complaint with the hospital.

76.  Despite being shown the explicit contractual language that belied the Union's purported reason for not fairly representing Nurse, the Union maintained its irrational, arbitrary, unfair, bad-faith, and discriminatory position of providing no assistance beyond perfunctorily filing a grievance that Corporate Defendants denied; at that point, Nurse realized any additional effort to obtain the Union's assistance would be futile and likely counterproductive due to the Union's bad-faith, improper motive of trying to avoid the necessary admission that it had repeatedly violated the explicit CBA language each time it wrongfully failed to help all similarly-situated employees

15

who came before Nurse.  As such an admission could potentially subject the Union to material liability by demonstrating its repeated violation of explicit CBA language due to, at best, its failure to ever read it, the Union deliberately violated its duty of fair representation to Nurse and failed to seek enforcement of the CBA's clear, explicit terms that beyond any reasonable doubt whatsoever require "just cause" be demonstrated for discipline and/or termination of "any employee," regardless of whether the employee is a Full Time Permanent Employee, Part Time Permanent Employee, Per Diem Employee, or Temporary Employee, and that discrimination is prohibited against "any employee" regardless of whether the employee is a Full Time Permanent Employee, Part Time Permanent Employee, Per Diem Employee, or Temporary Employee   Moreover, the Union representative had previously worked in the JSUMC Cath Lab decades earlier, remained friendly with Defendant Diamond over several decades, and sought to protect Diamond's wrongful actions rather than observe the duty to fairly represent Nurse.

### AS AND FOR A SECOND CAUSE OF ACTION

**(Breach of Explicit, *Woolley*, and *Pierce* Contracts)**
**(Corporate Defendants)**

77.  Nurse repeats and realleges each and every allegation set forth above as if fully set forth herein.

78.  Defendants failed to provide Nurse the contractually, ethically, and professionally required Preceptorship owed to a JSUMC Registered Professional Nurse as a means of advancing the nursing profession, "differentiat[ing] Meridian Health from other hospital employers and deliver[ing] a true competitive advantage for hiring and retaining nurse professionals," and enhancing patient care pursuant to the Corporate Defendants' "RN Preceptor Program." Defendants' termination of Nurse was motivated by, *inter alia*, Nurse's effort to be assigned an effective Preceptor (rather than Clark for the first four-week period) who, *inter alia*, provides patient care that satisfies hospital, ethical, professional, and legal duties and reporting requirements designed for patient safety.

79.  Defendants failed to afford Nurse the contractually guaranteed procedural mechanisms prior to termination including, *inter alia*, those detailed in Meridian Health's "Guidelines for Cooperation and Discipline" written by John Sindoni and in effect since January 14, 2003.  Defendants similarly failed to afford Nurse numerous other contractual guarantees

including, *inter alia*, Board of Review in connection with the Corporate Defendants' Guaranteed Fair Treatment Policy, the completion of Daily Coaching Plan Forms, and provision of numerous other verbal and written evaluations.

80.   Defendants failed to provide Nurse the contractually required uniform application of discipline and termination in that no other employee at JSUMC was ever terminated nor even disciplined for perpetrating Nurse's purported "deficiencies," including no female in the JSUMC Cath Lab.

81.   Defendants violated the implicit contractual guarantee that it would not terminate a Registered Professional Nurse for satisfaction of the nurse's duties under the New Jersey Nurse Practice Act and the American Nurses Association's Code of Ethics, ***which Defendants specifically require its nurses to follow.*** By ***explicitly requiring*** their Registered Professional Nurses to ***"report illegal, incompetent or impaired practice"*** and to "[c]orrect[] potential safety hazards . . . ***and report them"*** (emphasis added), Defendants are contractually prohibited from interfering with the nurse's obligation to so act. Defendants violated the contractual prohibition by terminating Nurse for satisfying his required ethical and contractual obligation to report to Diamond and Cusson Clark's multiple instances of unsafe and illegal activity, including her "completion" of documentation sheets for JSUMC Cath Lab procedures that regularly leave out nearly half the required information, including vital signs and assessments of pulses peripheral to the catheterization access site, and Clark's repeated failure to use a monitor when transporting patients post-cardiac intervention to another Unit in the hospital that directly violate hospital, ethical, professional, and legal duties and reporting requirements designed for patient safety.

82.   As a direct and proximate result of Defendants' breach of contract and concomitant false portrayal of the reason for Nurse's termination, Nurse's professional license is at risk of revocation and Nurse has been effectively rendered unemployable for the remainder of what would otherwise be Nurse's decades-long career. Damages are demanded for, *inter alia*, lost wages, lost bonuses, lost health, life, pharmacy, vision, and critical care insurance benefits, lost pension benefits, lost employer HPAE Retiree Medical Trust payments, lost employer FICA contributions, lost pre-tax savings benefits, lost continuing education benefits, and lost tuition reimbursement benefits in a dollar amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Violation of Conscientious Employee Protection Act, N.J.S.A. 34:19-3)

### (Hospital Defendants)

83.  Nurse repeats and realleges each and every allegation set forth above as if fully set forth herein.

84.  Nurse was terminated for, *inter alia*, reporting to Cusson, Diamond, and others the violations by Clark of the most fundamental requirements that patients be assessed, their care completely and contemporaneously documented, and their transport provided in accordance with the safety mandates of the New Jersey Administrative Code's Hospital Licensing Standards.  <u>E.g.</u>, N.J.A.C. 8:43G-7.14(d)(8) ("For all procedures in the ***cardiac catheterization laboratory*** a postcatheterization report shall be entered in the ***patient's medical record*** immediately after the procedure [and] shall include ***at least . . . <u>Palpation of pulses</u>***." (emphases added)); N.J.A.C. 8:43G-5.5(b) ("[H]ospital shall ensure the ***safe transport of patients within the hospital***, according to each patient's ***medical needs*** [and] shall include at least interdepartmental reporting of ***incidents and changes in the patient's condition during transportation***," which necessitates ***cardiac monitoring of patients who have undergone a cardiac intervention*** (emphases added)); N.J.A.C. 8:43G-15.7(b) (mandating "monitoring [of] medical records for accuracy [and] ***completeness***" (emphasis added)); N.J.A.C. 8:43G-18.5(e) (mandating that "nursing interventions[] and patient responses . . . ***be documented in the medical record***" (emphasis added)).

85.  Clark's purported "completion" of documentation sheets for JSUMC Cardiac Catheterization Lab procedures—that regularly leave out nearly half the required information, ***including vital signs and <u>assessments of pulses peripheral to the catheterization access site</u>***— and Clark's repeated failure to use a cardiac monitor when transporting patients post-cardiac intervention to another Unit in the hospital violate these New Jersey mandates of safe patient care for a ***hospital's cardiac catheterization laboratory***.

86.  Damages under the Conscientious Employee Protection Act include, *inter alia*, reinstatement, lost wages, lost benefits, front pay, attorneys' fees, and punitive damages.

18

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Violation of NJ Law Against Discrimination, N.J.S.A. sec. 10:5-12)

### (Hospital Defendants)

87.  Nurse repeats and realleges each and every allegation set forth above as if fully set forth herein.

88.  No female JSUMC Cath Lab Staff Nurse has ever been subject to discipline nor termination for the supposed "deficiencies" during her first three months of work nor at any other time in the JSUMC Cath Lab that were purportedly cited by Defendants in justifying Nurse's termination.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Defamation, Libel, Libel *Per Se*, Slander)

### (Hospital Defendants)

89.  Nurse repeats and realleges each and every allegation set forth above as if fully set forth herein.

90.  Defendants defamed, libeled, libeled *per se*, and slandered Nurse by Clark's verbal publication of knowingly false statements (i.e., made with malice) concerning Nurse's professional abilities and Lovey's verbal and written publication of knowingly false statements (i.e., made with malice) concerning Nurse's professional abilities, such as falsely stating that Nurse had no critical care nursing abilities, and the failure of all Defendants to afford Nurse the contractually guaranteed procedural mechanisms for responding to the defamation prior to summary termination despite repeated requests, which summary termination itself violates the contractual guarantees.  The failure of the Defendants to discuss Clark's and Lovey's false statements with Nurse, let alone disavow them, operate as the Corporate Defendants' adoption of Clark's and Lovey's knowingly false statements in the event each and every Defendant had not previously been cognizant of their falsity when Clark and Lovey first communicated them.

91.  As a direct and proximate result of Defendants' false portrayal of the reason for Nurse's termination, Nurse's professional license is at risk of revocation and Nurse has been effectively rendered unemployable for the remainder of what would otherwise be Nurse's decades-long career.  Damages are recoverable for, *inter alia*, lost wages, lost bonuses, lost tax-free health, life, disability, pharmacy, vision, and critical care insurance policies and benefits for Nurse and Nurse's family, lost pension and retirement account benefits, lost pre-tax savings benefits, lost tax-

free healthcare expense reimbursement benefits, lost tax-free continuing education benefits, lost tax-free tuition reimbursement benefits, lost tax-free scholarships, lost clinical ladder wage enhancements, lost overtime wage payments, lost on-call wage payments, lost seniority benefits and preferences, and lost Federal Insurance Contributions Act payments in a dollar amount to be determined at trial.

92.  Defendants conspired by means of mutual understanding, either expressly or impliedly, among themselves and others for the purpose of defaming, libeling, libeling *per se*, and slandering Nurse's professional abilities and thereby tortiously interfered with his economic relations with JSUMC, state licensing boards, and prospective employers, Registered Professional Nurses, and healthcare providers.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Tortious Interference with Prospective Economic Advantage)
### (Hospital Defendants)

93.  Nurse repeats and realleges each and every allegation set forth above as if fully set forth herein.

94.  Defendants made knowingly false statements concerning Nurse's professional abilities and failed to correct same despite demonstration of the statements' falsity and Nurse's repeated requests that Defendants state the truth.

95.  Defendants conspired by means of mutual understanding, either expressly or impliedly, among themselves and others for the purpose of defaming, libeling, libeling *per se*, and slandering Nurse's professional abilities and thereby tortiously interfered with his employment with JSUMC, state licensing boards, and prospective employers.

96.  As a direct and proximate result of Clark's and Lovey's knowingly false verbal and written statements in connection with the conspiracy of Individual Defendants to defame Nurse, Nurse was terminated by JSUMC.  As a direct and proximate result of all Defendants' knowingly false portrayal of the reason for Nurse's termination, Nurse's professional license is at risk of revocation and Nurse has been effectively rendered unemployable for the remainder of what would otherwise be Nurse's decades-long career.  Damages are demanded for, *inter alia*, lost wages, lost bonuses, lost health, life, pharmacy, vision, and critical care insurance benefits, lost pension benefits, lost pre-tax savings benefits, lost continuing education benefits, lost tax-free

scholarships, and lost tax-free tuition reimbursement benefits in a dollar amount to be determined at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Violation of SPHR Ethical Duties Owed by Luciani to Nurse as Third-Party Beneficiary)
### (Luciani and Corporate Defendants)

97.   Nurse repeats and realleges each and every allegation set forth above as if fully set forth herein.

98.   Luciani earned the Senior Professional in Human Resources ("SPHR") certification the HR Certification Institute, whose SPHR certification exam tests candidates' knowledge of, *inter alia*, "Human Resources laws and regulations."  Luciani's paid membership in the HR Certification Institute and prominent use of her SPHR certification requires her adherence to the HR Certification Institute's Code of Ethical and Professional Responsibility, which mandate that Luciani "foster a . . .work environment free of . . . ***unlawful discrimination***" and that she "***[i]nvestigate the accuracy and source of information before*** allowing it to be used in employment-related decisions" (emphases added).

99.   Nurse, as a former employee of Corporate Defendants, is a third-party beneficiary to Luciani's contractual duty to adhere to the HR Certification Institute's Code of Ethical and Professional Responsibility, which Luciani breached by approving of Nurse's termination that violated, *inter alia*, the New Jersey Law Against Discrimination, the Conscientious Employee Protection Act, Nurse's Woolley contract, and Meridian Health's "Guidelines for Cooperation and Discipline."  Significantly, Luciani provided Corporate Defendants' ratification of Nurse's illegal termination and defamation by way of her termination letter, which made clear that during the purported "investigation" of Nurse's termination, Luciani communicated with and gave credence only to employees and low-level managers—all of whom had violated the Corporate Defendants' Code of Conduct—and thereby simply adopted the claims of the employees and low-level managers without independent analysis.

100.   As a direct and proximate result of Luciani's breach of her contractual and ethical duties under the HR Certification Institute's Code of Ethical and Professional, Nurse's professional license is at risk of revocation and Nurse has been effectively rendered unemployable

for the remainder of what would otherwise be Nurse's decades-long career.  Damages are demanded for, *inter alia*, lost wages, lost bonuses, lost health, life, pharmacy, vision, and critical care insurance benefits, lost pension benefits, lost employer HPAE Retiree Medical Trust payments, lost employer FICA contributions, lost pre-tax savings benefits, lost continuing education benefits, and lost tuition reimbursement benefits in a dollar amount to be determined at trial.

   **WHEREFORE**, Nurse demands Judgment as follows:

   A. Reinstatement of employment with compensation for all lost wages, lost bonuses, benefits, pension benefits, overtime pay, on-call pay, vacation pay, holiday pay, 403(b) "matching" pay, employer-paid Federal Insurance Contributions Act payments, employer-paid HPAE Retiree Medical Trust payments, and other remuneration and advancement of Nurse on the seniority ladder for wage, vacation scheduling, pension accrual, CARE Ladder participation, and all other purposes, including tuition reimbursement and scholarships, to reflect as though Nurse had worked at JSUMC Cath Lab since Nurse's start date without interruption through the date of reinstatement;

   B. A declaration (I) that Individual Defendants' actual motive for terminating Nurse's employment was to (i) maintain a 100%-female Staff Nurse workforce in the Cardiac Catheterization Lab, (ii) argue to upper management that Nurse's professional certifications are thereby meaningless and Individual Defendants should consequently not be expected to attain, nor evaluated negatively for failing to earn, those difficult certifications, and (iii) punish and get rid of Nurse for Nurse's assiduous compliance with and adherence to hospital, ethical, professional, and legal policies and reporting requirements, including Nurse's required reporting illegal patient care including, *inter alia*, that of Clark; and (II) that Defendants' purported claims concerning Nurse's performance and professional abilities are in fact false;

   C. A permanent injunction requiring that Defendants and their agents, servants, employees, officers, directors, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them, cease directly or indirectly making false statements concerning Nurse's performance and professional abilities;

   D. Compensatory damages in an amount to be determined at trial;

   E. Punitive damages in an amount to be determined at trial in order to punish Defendants for their extreme and outrageous conduct in cruelly destroying the career of a

terminated employee and to deter Defendants and other employers, managers, coworkers and unions from engaging in similar egregious and unconscionable activity;

    F.  Pre- and post-judgment interest on all amounts awarded;

    G.  The costs and reasonable attorneys' fees incurred in prosecuting this action; and

    H.  Such other and further relief as this Court shall deem just and proper.


Dated:  Florham Park, New Jersey
   September 23 , 2013


        **JARDIM, MEISNER & SUSSER, P.C.**

        By: _____/s/_____
          Thomas C. Jardim

        30B Vreeland Road, Suite 201
        Florham Park, New Jersey 07932
        TOM@JMSLAWYERS.COM
        (973) 845-7640

        *Counsel for Plaintiff*

# EXHIBIT A

Search



# Guidelines for Cooperation and Discipline
Human Resources Policies & Procedures

| | |
|---|---|
| Document Number: MHS-HR-01-2602 | Revision #: v1 |
| Document Owner: John E. Sindoni, SPHR | Date Last Updated: 07/31/2008 |
| Author: N/A | Status: Approved and Released |
| Date Originally Created: 01/14/2003 | |

## General Description

Purpose: This policy and procedure is designed to assist all members of the Meridian Health (MH) staff involved in the administration of a progressive disciplinary process. It is intended to also improve the communication to all team members of what the actual MH guidelines for cooperation are in the regular performance of their work – in essence, the rules and regulations.

Scope: All team members of Meridian Health and its partner companies, including Meridian Hospitals Corporation and its hospitals.

Policy: There will be formally defined rules and regulations for all team members known as Guidelines for Cooperation which will be communicated to all team members on staff and new team members at the time of hire by means of verbal communication, the team member handbook and the policy manual located on the Meridian Health Intranet.

These guidelines will be centrally administered and uniformly interpreted to ensure equity of application within MH. It is the obligation of every team member to conform to the guidelines applicable to their individual position, as well as the general rules and regulations which apply to all team members.

Team members that exhibit problem behavior, i.e., behavior that if unchecked can lead to serious problems or over the long term can contribute to performance problems, should be approached by the supervisor and the situation discussed with the team member. It is the supervisor's discretion to discuss the situation with the team member or begin the disciplinary process.

A progressive four-step disciplinary process will be followed in cases involving level I infractions. In cases involving a level II (gross) infraction where discharge from staff is requested, a three-step process will be followed which involves a three (3) day suspension without pay, investigation of charges and a disciplinary review process meeting to establish either upholding the suspension, termination, or reinstatement. In cases which result in a suspension or termination, the team member may request a Board of Review in connection

with the Guaranteed Fair Treatment Policy through their administrative representative.

When a team member is arrested in connection with an external matter, MH reserves the right to place the team member on suspension without pay pending the outcome of the criminal court decision. If the team member is vindicated, team member status can be reinstated without back pay. If convicted, the team member will be terminated from MH. However if the team member voluntarily enters the pretrial intervention program MH may in its sole discretion choose to reinstate the team member without back pay. Should the matter not be resolved within 6 months of the arrest, the team member will be separated from employment.

A team member who is arrested for or convicted of a criminal offense other than traffic violations, must promptly inform his/her leader and the senior vice president of Human Resources of the arrest, the nature of the charges, and the ultimate disposition of the charges. Failure to do so is grounds for discipline, up to and including discharge. Such arrest/conviction may subject the team member to discipline, up to and including discharge depending upon the circumstances involved.

PROCEDURE FOR LEVEL I INFRACTIONS

1. Whenever a team member violates one or more infractions in the same level and the supervisor determines that the disciplinary process should be initiated (refer to paragraph three under Policy) a team member Disciplinary Notice form is prepared. The first warning block is checked. The specific infraction(s) involved and all pertinent data, i.e., date, time, places, etc., is included. The four-part form is distributed according to the instructions on the form.

2. The team member Disciplinary Notice is to be issued within a reasonable time (five (5) working days) after the infraction(s) occurs or notification to leader of incident and in as confidential a setting as possible. The team member has a right to write a rebuttal and/or refuse to sign the notice. A witness should be called in cases when a team member refuses to sign the notice – only to witness the refusal to sign and not the details of the notice contents. The witness preferably should be at the supervisory level.

3. The second violation of one or more infractions in the same level which occurs within 12 months from the initiation of the first warning is to be documented on a team member Disciplinary Notice form as a second warning.

4. The third violation of one or more infractions in the same level which occurs within 12 months from the initiation of the second warning is to be documented on a team member Disciplinary Notice form as a final warning and the team member will be placed on probation.

NOTE: The disciplinary steps set forth in the team member handbook and policy manual providing for progressive discipline (e.g., written warnings, probation, discharge) DO NOT APPLY to violations of the sexual harassment, substance abuse, fitness for duty and workplace violence policies. The discipline imposed for violations of the sexual harassment, substance abuse, fitness for duty and workplace violence policies shall be governed solely by provisions set forth in those policies.

5. The next violation of one or more infractions in the same level which occurs within 12 months from the initiation of the third (final) warning is to be documented on a team member Disciplinary Notice form and will serve as a termination notice to the team member.

6. When a team member successfully completes the 12 month probationary period all documentation of level I disciplinary action shall be removed from the employment file. This does not apply to suspensions which are sustained in connection with gross (level II) infractions.

Level I Infractions:

- Excessive unscheduled absences (Refer to Guideline #1).

- Unauthorized and/or unscheduled absence from duty or work location.

- Excessive unauthorized and/or unscheduled lateness for duty. (Refer to Guideline #2)

- Failure to comply with Meridian's photo-identification or other security policies.

- Presence in unauthorized areas of MH. (Refer to Guideline #3)

- Failure to perform duties as assigned or to a reasonable satisfactory degree/failure to follow the Meridian Way standards of behavior and conduct.

- Failure to follow MH policy resulting in non serious consequences.

- Conducting raffles, pools or other games of chance on any MH premises without administrative approval.

- Excessive failure to punch in/out or use authorized time and attendance readers. (Refer to Guideline #4)

- Selling or advertising merchandise, tickets or services without prior written approval by administration.

- Creating an unsafe or unsanitary condition or contributing to such conditions.

- Smoking in unauthorized areas.

- Parking of vehicles in unauthorized areas of MH property without administrative approval.

- Soliciting or accepting tips, gifts or other gratuities from patients, other team members, MH visitors or vendor/contractors.

- Unauthorized use of MH mails, telephones, equipment or supplies for personal business.

- Disregard of one's appearance, uniforms, dress or personal hygiene that is detrimental to patient care, safety and/or MH or departmental standards.

- Distribution of unauthorized literature/pamphlets by team members during work time or in working and patient care areas.

- Solicitation for unauthorized purposes during working time or in working and patient care

areas. ( Refer to Guideline # 5)

- Failure to comply with department notification requirements in cases of unauthorized absences, illness and/or lateness.

- Illegible handwriting (refer to guideline # 6)

- Accessing information that is not necessary to perform one's job.

- Sharing computer access codes (user name and/or password).

GUIDELINES

The definition of absence is any unscheduled time lost from work regardless of reason. The term unscheduled excludes PTO (paid time off) scheduled at least 24 hours in advance, leaves of absence, jury duty, bereavement leave, workers' compensation time and absences which have been approved in advance. It also excludes time lost when the occupational health service, for patient protection, advises that an team member be sent home due to suspected infectious diseases (e.g., exposure to chicken pox).

Within the guidelines of the Family Medical Leave Act (FMLA) under certain conditions an team member may be granted intermittent leave (time taken in separate blocks of time for an illness or injury) or choose a reduced work schedule (reduction of days worked in a work week or hours worked in a work day) for conditions of limited duration such as pregnancy, chemotherapy, asthma, etc. Such absences will not be counted as occurrences in accordance with the FMLA. Medical documentation may be required in such cases.

1. Absenteeism is excessive when scheduled work time is missed at a rate of 2.5% or more in any sliding 12 month period. Initially the sliding 12 month period will commence from the date of the first absence, thereafter, it will commence from the date of the last infraction (warning) related to unscheduled absence.

2. Excessive lateness - any combination of days of occurrence where the total minutes late exceeds one hour per sliding 30 day period.

3. Unauthorized area - areas designated as restricted to only certain persons and/or areas not frequented in the regular performance of assigned duties.

4. Excessive failure to utilize T&A system - upon the second occurrence of failure to punch in/out or use an authorized reader within a sliding 30 day period.

5. Working time does not include meal breaks, work breaks or any time that an team member is not assigned to be working.

6. One (1) occurrence of illegible handwriting will result in a Level I infraction.


PROCEDURE FOR LEVEL II (GROSS) INFRACTIONS

1. Whenever a team member violates one or more infraction(s) in the same level they are to

Case 3:10-cv-06798-JAP-LHG   Document 43   Filed 09/27/13   Page 29 of 35 PageID: 982

be issued a team member Disciplinary Notice stating the specific infraction(s) involved and all pertinent data (dates, times, places). The four-part form is distributed as indicated on the bottom of the form.

2. Unless there is insubordination or a demonstrated clear and present danger to patients or staff personnel, a team member should not be suspended prior to review and consultation taking place with the director of human resources, the senior vice president of human resources, administrative representative or administrator-on-call.

3. The team member disciplinary notice and suspension are to be issued within a reasonable time after the infraction(s) occurs and in as confidential a setting as possible. The team member has the right to write a rebuttal and/or to refuse to sign the notice. A witness should be called in cases when the team member refused to sign the notice - only to witness the refusal to sign and not the details of the notice contents. The witness preferably should be at the supervisory level.

4. No team member will be discharged from staff without the disciplinary review process. The team member shall be placed on suspension without pay pending investigation and the disciplinary review process meeting.

5. The matter will be investigated and the disciplinary review meeting will then be scheduled within three (3) working days of the date the suspension began.

6. The persons present at the disciplinary review meeting may include the team member(s), supervisor of the team member and/or the department manager, human resources manager, administrative representative of the department, and the director of team member and labor relations as the disciplinary review officer. Attorneys and third-party representatives are not permitted to participate during the disciplinary review.

7. The team member will be permitted to have other MH persons or team members present at the disciplinary review process meeting if they are able to provide factual data. A written request from the team member to the human resources site manager must be received and approved at least one working day in advance of the meeting. The human resources site manager is authorized to reject the presence of any persons at the meeting who have not been previously approved to appear. All information presented at the meeting must be true and factual. Failure in this respect will eliminate consideration of the information presented.

8. Team member Disciplinary Notice forms, team member performance appraisals, letters of commendation, and all related aspects of an team member's human resources profile may be considered in the the deliberations of the disciplinary review officer inclusive from the original date of hire. All pertinent factual data and/or testimony will be considered during the disciplinary review process, and a final decision rendered within five (5) working days after the meeting.

9. The use of a tape recorder device during the disciplinary review proceedings is not permitted.

Level II (Gross) Infractions

The following are classified as gross infractions and will result in suspension without pay

pending investigation and a disciplinary review process meeting to establish either upholding the suspension, termination or reinstatement.

- Failure to maintain confidentiality of a patient's condition and/or illness. Viewing and/or sharing confidential information without authorization.

- Falsification of any MH document or record.

- Unauthorized use of recording equipment on any MH premises.

- Sleeping while on duty.

- Direct or tacit refusal to comply with a supervisor's instructions or perform a job assignment.

- Failure to properly render service to a patient, when such service is within the regular and/or reasonable scope of a team member's duties, or is required in a bona fide emergency.

- Use of abusive language and/or unnecessary shouting in a patient care, public contact or general work area.

- Reporting for duty in a condition which is unfit for proper performance of assigned work. (Refer to Fitness for Duty policy).

- Use or possession of a weapon on MH premises.

- Misappropriation, unauthorized possession or misuse of property belonging to MH or any team member, patient or MH visitor.

- Unauthorized possession, misuse, reading or copying of MH documents or records or disclosure of information of such records to unauthorized persons.

- Threatening, intimidating or coercing of another team member, patient or MH visitor including verbal or physical altercations or related disorderly conduct.

- Any illegal act or conduct on MH property/theft.

- Discussing confidential information with unauthorized person.

- Any act or conduct which is seriously detrimental to patient care or MH operations.

- No call - no show 3 days - immediate termination.

- 2nd Level II infraction - immediate termination.

Any questions regarding this policy and procedure may be referred to the Human Resources Site Leader, the Human Resources Generalist, the Director of Human Resources, or the Senior Vice President of Human Resources.

 Top

## Special Notes / Appendix

(1) Team members who are in a leadership role include positions such as executives, administrators, directors, department leader middle management, front line supervisors and above are employed at-will. This means that either they or Meridian can terminate their employment at any time, for any or no reason and with or without notice. Nothing in this policy changes their at-will status. As such, nothing this policy constitutes a contract of employment, including but not limited to, the Guidelines for Cooperation and Discipline, the Guaranteed Fair Treatment Policy, and the Conflict Resolution/Peer Mediation provisions of this policy or any other policy. Furthermore, no representative of Meridian, other than the President in a writing signed by the team member and the President, has any authority to enter into any agreement, written, oral or otherwise, for employment for any specific period of time or to make any agreement contrary to the foregoing as it relates to the Administrative Staff and Department Managers above.

(2) Attorneys or other third party agents will not be permitted to appear on behalf of MH or otherwise represent the team member(s) in the internal disciplinary review process.

 Top

## Related Documents

The following is a list of other documents related to the current document. Changes you make to the current document may affect the documents listed.

External N/A
Related
Documents

Revision #:
1.0
01/14/2003

Revision #:
v0
01/06/2004
This document was modified as a result of a system replace.

Revision #:
v0
04/24/2006
This document was modified as a result of a system replace.

Revision #:
v0
04/24/2006
This document was modified as a result of a system replace.

Revision #:

v0
05/12/2006
This document was modified as a result of a system replace.

**Revision #:**
v1
03/15/2007
Start new revision level.

**Revision #:**
v1
12/12/2007
This document was modified as a result of a system replace.

**Revision #:**
v2
03/17/2008
Changed where policy manuals are located.

**Revision #:**
v1
04/08/2008
Minor changes in wording.

**Revision #:**
v1
04/08/2008

**Revision #:**
v1
07/31/2008
minor word changes

**Revision #:**
v1
07/31/2008

**Revision Notes:** Replaces Policy:
MH-HR-6.2: Guidelines for Cooperation and Discipline

 Top

This page created using Zavanta® version 3.5

# EXHIBIT B



# Daily Coaching Plan

NAMES: Preceptor _____ ORIENTEE _____ DATE _____

1) The preceptor and new employee start the day with a recap of the previous shift.
2) Emphasize the successes of the nurse and encourage their development of critical thinking skills.
3) Begin the shift by establishing goals, priorities and expectations for the day using the chart below.
4) Review the charting and computer skills of the new hire.
5) Update the checklist daily and meet with the educator each week to discuss goal achievement and planning issues.
6) Progress towards goals is discussed in regularly scheduled meetings with the nurse manager.
7) **This form is to be completed DAILY and turned into the Nurse Manager at the end of each shift.**

| PATIENT DIAGNOSIS | Priority (1-10) | Complexity LOW (L) | Complexity MEDIUM (M) | Complexity HIGH (H) | Patient GOALS (State 2 priority goals for the day) |
|---|---|---|---|---|---|
| 1. | | | | | 1.<br>2. |
| 2. | | | | | 1.<br>2. |
| 3. | | | | | 1.<br>2. |
| | | | | | 1.<br>2. |
| 5. | | | | | 1.<br>2. |
| 6. | | | | | 1.<br>2. |
| 7. | | | | | 1.<br>2. |
| 8. | | | | | 1.<br>2. |
| 9. | | | | | 1.<br>2. |

White Copy- Orientee          Yellow Copy -Nurse Manager          Pink Copy- Nursing Education          Page 1

© 2005 Meridian Health

| Element | Rating | Comments |
|---|---|---|
| **Assessment**<br>· Accurately completes full nursing assessment<br>· Demonstrates appropriate time management with patient assessment | | |
| **2. Planning**<br>▪ Prioritizes workload<br>▪ Organizes daily assignments<br>▪ Develops evidence-based patient plan of care | | |
| **3. Implementation**<br>▪ Delivers nursing care using proper clinical skills in accordance with standards, policies, and procedures<br>▪ Establishes and maintains a safe patient environment<br>▪ Demonstrates appropriate and effective delegation and supervision | | |
| **4. Evaluation**<br>▪ Evaluates effectiveness of care in a timely manner and makes appropriate changes to the plan of care | | |
| **5. Documentation**<br>▪ Documents care in a clear and concise manner in the paper and electronic records<br>▪ Documents appropriately in the ITP | | |
| **6. Communication**<br>▪ Identifies & reports significant changes in patient condition to appropriate staff<br>▪ Communicates effectively with patient and family members | | |
| **7. Education**<br>· Recognizes self-learning needs and takes initiative and demonstrates appropriate follow-through<br> Develops, implements, and evaluates appropriate education plans for patients and family members<br>▪ Provides education to patient appropriately with consideration for cultural aspects, age, and ability to learn | | |
| **8. Professionalism**<br>▪ Consistently practices in a caring and compassionate manner<br>▪ Effectively functions as a patient and family advocate<br>▪ Demonstrates ethical and professional integrity and values with respect to patient care and collegial relationships | | |

**Scoring Key**
1 – **Identified Limitation** - requires direct guidance & support, little or no experience with skill
2 – **Capable** - familiar with skill/equipment but may need assistance, seeks help appropriately
3 – **Performs independently** - knowledgeable to perform these tasks safely as a result of training and experience
4 – **Proficient** - extensive experience in this area/skill, able to teach and mentor others

COMMENTS/GOALS: _____

_____

_____

_____

**Both pages of this form are to be completed DAILY and turned into the Nurse Manager at the end of each shift.**

· ·entee Signature: _____   Date: _____

  _eptor Signature: _____